UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | |
| v. | * | Criminal No. L-10-0336 |
| | * | |
| **DIONE FAUNTLEROY, JR.,** et al. | * | |
| | * | |
| | ******* | |

**MEMORANDUM**

This is a drug conspiracy case. On June 16, 2010, a federal grand jury returned a twelve-count indictment that charged 22 defendants, including Dione Fauntleroy, Jr., with conspiring to distribute controlled substances. Fauntleory, Jr., has filed several motions, which many of his co-Defendants have joined.[1] The motions have been fully briefed, and on July 7, 2011 the Court held a full-day motions hearing. For the reasons stated herein, the Court will, by separate Order of even date DENY the following Motions:

- Amended Motion to Suppress Evidence Obtained by Electronic Surveillance and Interception by Wire and Fruits of Wiretapping by Dione Fauntleroy, Jr. Docket No. 462.

- Motion to Sever Defendant, or in the alternative, Motion to Dismiss Count One of the Superseding Indictment as Duplicitous by Dione Fauntleroy, Jr. Docket No. 464.

- Motion for Bill of Particulars by Dione Fauntleroy, Jr. Docket No. 323.

---

[1] To the extent that other Defendants have joined the motions addressed herein or filed substantially similar motions, the Court's analysis will apply equally. A separate order will dispose of these and other miscellaneous motions.

- Amended Motion to Suppress Tangible Evidence and Derivative Evidence by Dione Fauntleroy, Jr.  Docket No. 463.
- Motion to Suppress Evidence Seized by Taii Speaks.  Docket No. 468.

The motions will be addressed seriatim.

## I. Motion to Suppress Wiretap Evidence

On March 25, 2010, Judge Timothy Doory of the Baltimore City Circuit Court approved an application submitted by the Baltimore City Police and the DEA for a wiretap on telephone numbers identified as the A-line and the B-line.  The A-line was believed to be used by Defendant Roger Ford.  The B-line was believed to be used by Defendant Travis Stanfield.  Later in the investigation, subsequent wiretap orders were obtained for the C-line (believed to be used by Fauntleroy, Jr.), the D-line (believed to be used by Robert Campbell), the E-line (also believed to be used by Robert Campbell), the F-line (believed to be used by Damian Jackson), and the G-line (believed to be used by Fauntleroy, Jr.).

Fauntleroy, Jr., has filed an Amended Motion to Suppress Evidence Obtained by Electronic Surveillance and Interception by Wire and Fruits of Wiretapping (hereinafter Fauntleroy, Jr., Am. Mot. to Suppress Wiretap Evid.).  Docket No. 462.  All subsequent wiretap applications incorporated the affidavit used to obtain the A-line and B-line wiretaps, and also relied heavily on information gained from the A- and B-lines.  It is, therefore, the taps on the A-line and the B-line that Fauntleroy, Jr., principally challenges.[2]

---

[2] Though there is no allegation that either the A-line or the B-line belonged to Fauntleroy, Jr., 18 U.S.C. § 2518(10)(a) and Md. Cts. & Jud. Proc. § 10-408(i)(1) permit any "aggrieved person" to move to suppress evidence derived from electronic surveillance.  An "aggrieved person" is defined as "a person who was a party to any interested wire, oral or electronic communications or a person against whom the interception was directed." 18 U.S.C. § 2510(11); Md. Cts. & Jud. Proc. § 10-401(10).  Because the Government claims that it intercepted Fauntleroy, Jr. on the A- and B-lines, as well as all other lines, he has standing to challenge the admissibility of any evidence thus obtained.

Fauntleroy, Jr., advances several arguments in support of his Motion. First, he urges that the affidavit was misleading and lacking in probable cause to issue the wiretap orders. Second, he argues that the government failed to exhaust normal investigative techniques before seeking to obtain wiretaps. Finally, he argues that police did not reasonably minimize the duration of communications intercepted, as required by the wiretap Orders. None of these positions is availing.

**A.  Probable Cause**

As to probable cause, Fauntleroy, Jr., claims that the confidential sources and informants utilized by the police were unreliable, and that recorded calls and controlled buys performed by these sources, as well as physical surveillance conducted by the police, are not necessarily probative of an overarching drug conspiracy. He further argues that the affidavit and the sources relied upon therein mention him only minimally.

Md. Code Ann., Cts. & Jud. Proc. § 10-408(c), which governs the issuance of wiretaps, requires that the issuing court find:

> probable cause for belief that an individual is committing, has committed or is about to commit a particular offense enumerated in §10-406 of this subtitle; . . . probable cause for belief that particular communications concerning that offense will be obtained through the interception of communications over the targeted communication device; [and] probable cause for belief that the facilities from which, or the place where, the wire, oral or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense . . . .

The standard of review governing affidavits in support of wiretap orders is identical to the standard governing the review of search warrants, because a wiretap order is a specialized sort of search warrant. United States v. Talbert, 706 F.2d 464, 467 (4th Cir. 1983). A reviewing court is not to substitute its judgment as to probable cause, but need only determine whether there was

3

a substantial basis for the issuing court's determination of probable cause.  Illinois v. Gates, 462 U.S. 213, 238–39 (1983).

It is clear from the Court's review that the affidavit presented to Judge Doory, which runs to 82 pages, contains more than ample probable cause.  Fauntleroy, Jr., Am. Mot. to Suppress Wiretap Evid. Ex. 1, Aff. in Supp. of Appl. for Order Authorizing Interception of Wire Communications (hereinafter "A/B-line Aff.'), Docket No. 462-2.  The fact that not all of the evidence is directly relevant to Fauntleroy, Jr., himself (or to any other individual Defendant) is immaterial, because there was more than enough evidence that drug crimes were being committed, that evidence of those crimes was likely to be obtained through the wiretap, and that the A- and B-lines were being used to facilitate the offenses.  The Court notes specifically that police, through confidential informants, placed calls to Defendants Ford and Stanfield over the the A- and B-lines on several occasions to arrange for controlled drug buys, and then observed as the transactions took place.  See A/B-line Aff. at 28–41.  It is difficult to imagine more direct and reliable evidence that these lines were being used in the commission of drug crimes.

As mentioned above, the affidavit submitted with the application for the A- and B-line wiretaps, in conjunction with information gained from intercepted calls over the A- and B-lines, provided the probable cause for subsequent wiretaps.  Fauntleroy, Jr., the alleged principal user of the C-line, was a party to numerous phone calls to and from the A-line, in which he was recorded discussing drug transactions with Ford.  See Fauntleroy, Jr., Am. Mot. to Suppress Wiretap Evid. Ex. 4, Aff. in Supp. of Appl. for Order Authorizing Interception of Wire Communications 15–31 (hereinafter "C-line Aff.), Docket No. 462-5.  The two talked about, inter alia, types and quantities of drugs, potential sources of supply, and the manufacture of crack from powder cocaine.  Id.  The contents of these calls, combined with the affiant agents'

4

interpretations of the often coded language used by Ford and Fauntleroy, Jr., were more than enough to support Judge Doory's determination that probable cause existed sufficient to warrant a wiretap on the C-line. By virtue of the same analysis, the wiretaps on the D-, E-, F-, and G-lines were also valid.

### B. Exhaustion

Fauntleroy, Jr., next argues that the wiretaps are invalid because law enforcement failed to exhaust traditional investigative methods. Under 18 U.S.C. § 2518(1)(c), a wiretap application must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Maryland's state-law exhaustion requirements, which are set forth in Md. Code Ann., Cts. & Jud. Proc. § 10-408, are identical. United States v. Bullock, No. 95-5983, 2000 WL 84449, at * 4 (4th Cir. 2000). "[T]he burden that these provisions impose upon the government to show the inadequacy of normal investigative techniques is not great, and the adequacy of such a showing is 'to be tested in a practical and commonsense fashion' . . . that does not unduly hamper the investigative powers of law enforcement agents." United States v. Smith, 31 F.3d 1294, 1297 (4th Cir. 1994) (quoting United States v. Clerkley, 556 F.2d 709, 714 (4th Cir. 1977)). When assessing the need for a wiretap, courts may properly consider the knowledge, training, and experience of the affiant on the subject of whether a particular investigative technique is likely to succeed or fail. See Smith, 31 F.3d at 1299; Clerkley, 556 F.2d at 715.

The A/B-line affidavit discusses at length other investigative techniques that police either utilized or considered using. Specifically, it analyzes the past and probable future results of using confidential sources and informants, undercover officers, co-conspirator cooperation,

search warrants, physical surveillance, tracking devices, CCTV cameras, grand jury investigations and witness interviews, pen registers, and review of criminal histories.  A/B-line Aff. 68–80.  It is clear from the affidavit that none of these techniques, alone or in concert, would have led to the unraveling of the conspiracy.  This is demonstrated most aptly by Fauntleroy, Jr.'s own argument that the wiretap affidavit contains limited information regarding him specifically, though he was one of the alleged heads of the organization.  One of the very purposes of a wiretap is to allow law enforcement to ascertain the involvement of members of the organization whose role has not been established by traditional investigative techniques.  Likewise, Fauntleroy, Jr., cites evidence gained through the execution of search warrants on the residences of several members of the alleged conspiracy as proof that police could have obtained the information they needed though traditional methods.  In pressing this argument, however, Fauntleroy, Jr., ignores the point that many of the addresses to be searched, as well as much of the probable cause needed to obtain the search warrants themselves, came from the very wiretaps he claims to have been unnecessary.

Higher-ups in drug organizations often take care to obscure their tracks.  They use others to transport, process, and sell the drugs.  Cars, phones, and stash houses are not registered in their names.  Once the police have used traditional tools (e.g., surveillance) to investigate the visible parts of a drug organization, they must use wiretaps to reveal the parts that are hidden from view.  Like any business organization, a drug ring must rely on telephones to manage the ceaseless logistical details.  When, as in this case, probable cause has been established and the flow of information from traditional investigative techniques begins to run dry, investigators are entitled to a wiretap.  While a wiretap is not to be used as a first resort, it is, for these reasons, becoming

6

a routine and necessary tool in modern law enforcement operations investigating complex and opaque organizations.

### C. Minimization

Finally, Fauntleroy, Jr., asserts that the officers monitoring telephone calls in this case failed to minimize their interception of non-pertinent information as required by the wiretap orders. Title 18 U.S.C. § 2518(5) requires wiretap orders to include a directive that the order be executed "in such a way as to minimize the interception of communications not otherwise subject to interception." The minimization requirement is satisfied if the reviewing court finds that, in light of all of the facts and circumstances, "the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion." United States v. Tortello, 480 F.2d 764, 784 (2d Cir. 1973), cert denied, 414 U.S. 866 (1973).

The wiretap orders issued by Judge Doory contained a directive of the type required by 18 U.S.C. § 2518(5), and enumerated with specificity the subject matter that was fair game for interception. See Gov't's Opp. Ex. 2, Ex Parte Order Authorizing Interception of A-line 8–9, Docket No. 501-1. The instructions issued to all monitoring agents repeated the standard contained in the wiretap orders, and instructed the agents that all intercepted calls could be monitored for an initial period of two minutes "for the purpose of identifying the parties to the conversation and determining whether said conversation is criminal in nature or constitutes evidence of the offenses under investigation." Fauntleroy, Jr., Am. Mot. to Suppress Wiretap Evid. Ex. 5, Mem. re: Minimization of Interceptions of Wire and Electronic Communications 3, Docket No. 501-1. If, after the initial two-minute period, the monitoring agent designated the conversation as non-pertinent to the investigation, interception would have to be terminated. The instructions further authorized spot monitoring or spot checking, meaning that the monitoring

7

agent would be permitted to reactivate the interception of a call initially designated non-pertinent "every thirty (30) to sixty (60) seconds or so to determine if the parties or the nature of the conversation have changed to those covered in the order.  LISTEN JUST LONG ENOUGH TO GET THE GIST OF THE CONVERSATION." Id. at 4 (emphasis original).  The agent was instructed to use his or her judgment as to when and for how long to spot check, based on several factors.  These factors include the "parties to the conversation, precise relationship of the parties, the length of the relationship, the number of contacts between the parties, present status of the investigation, [and the] past conduct of the parties." Id. at 4–5.

Fauntleroy, Jr., first argues that "[t]wo minutes on its face is unreasonable when privacy rights are at issue."  Fauntleroy, Jr., Am. Mot. to Suppress Wiretap Evid. 33, Docket No. 462.  The Court disagrees.  Taking into consideration the complexity of the alleged conspiracy, the number of individuals involved, and the coded language that has become a fixture of communication in the world of illegal drugs, two minutes is a reasonable time in which to make an initial determination as to pertinence.  See United States v. Quintana, 508 F.2d 867, 874 (7th Cir. 1975) ("[l]arge and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode.  This is especially so where, as here, the judicially approved purpose of the wiretap is not so much to incriminate the known person whose phone is tapped as to learn the identity of far-flung conspirators and to delineate the contours of the conspiracy.").

Gone are the days when drug dealers discussed business by phone in a straightforward manner.  Today's recorded conversations are replete with code words and code phrases intended to veil the speaker's meaning.  For a reviewing court, the import of a call often becomes evident only by deconstructing the transcript with the assistance of expert testimony.  In fact, the very

abstruseness of the conversation raises legitimate suspicion. If the target of a wiretap is calling the gas and electric company about a bill, minimization is not a difficult task. When the target is talking to another suspect, however, and using language susceptible of multiple meanings, the monitoring agents are justified in listening longer and more closely.

Fauntleroy, Jr., then turns to statistical analysis of the call logs for the A-, B-, and C-lines in an attempt to show that the monitoring agents intercepted more of the conversations than necessary or permissible. See Fauntleroy, Jr. Corr. Am. Mot. to Suppress Wiretap Evid., Docket No. 495.[3] For example, as to the A-line, this analysis purports to show that only 35% of the total duration of non-pertinent calls was minimized, and that 3,545 calls not designated either pertinent or non-pertinent were not minimized at all. The latter point ignores, most notably, the fact that the vast majority of undesignated calls lasted in the neighborhood of 40 seconds, and so would never have been minimized whether pertinent or not. As to the total duration, the statistics for the A-line reveal that the average non-pertinent call lasted 8:02, of which 2:51 was minimized. Subtracting the initial 2-minute period discussed above, this leaves an average of 3:11 for spot monitoring.

While this may seem somewhat high, dealing in averages for thousands of calls that run the full range between hang-ups and lengthy conversations presents obvious difficulties, and the Court must exercise great care before substituting its own ex post judgment for that of the monitoring agents. "It is all well and good to say, after the fact, that certain conversations were irrelevant and should have been terminated. However, monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction a conversation will take." United States v. LaGorga, 336 F. Supp. 190, 196 (W.D. Pa. 1971). What is most telling is that

---

[3]   This corrected amended motion makes minor changes to the row numbering and identification in the tables found at pp. 33–36 of the principal Amended Motion to Suppress Wiretap Evidence, Docket No. 462.

Fauntleroy, Jr., has not identified a single discrete call that he contends was monitored more than necessary. Based on the evidence presented, the Court is unable to conclude that such monitoring constituted a failure to minimize as required by the issuing court's order.

For these reasons, the Motion to Suppress Evidence Obtained by Electronic Surveillance and Interception by Wire and Fruits of Wiretapping must be denied.

## II.  TANGIBLE AND DERIVATIVE EVIDENCE

On June 17, 2010, police executed a search warrant on 7503 Reserve Circle, Apt. 3, Woodlawn, Maryland. The apartment was believed to be the residence of Fauntleroy, Jr., and his girlfriend and co-Defendant Taii Speaks. The apartment was allegedly rented in Fauntleroy, Jr.'s mother's name in order to evade police detection. During the search, police recovered a Ruger P345 .45 caliber pistol with an obliterated serial number. Speaks moves to bar the introduction of the pistol against her at trial. Docket No. 468.[4]

Speaks makes two principal arguments in support of suppression. First, she challenges the Magistrate Judge's determination of probable cause to believe that she was engaged in criminal activity. Second, she contends that, even if probable cause existed as to her, there is an insufficient nexus between the address itself and any alleged criminal activity to justify a search of the premises. A district court has a limited role in reviewing an issuing magistrate's probable cause determination and must only "'ensure that the magistrate had a substantial basis for concluding that probable cause existed.'" United States v. Bynum, 293 F.3d 192, 202 (4th Cir. 2002), (quoting Illinois v. Gates, 462 U.S. 213, 238–39 (1983)). Because it is clear that the

---

[4] While the fruits of this search are nominally challenged by both Speaks (Docket No. 468) and Fauntleroy, Jr., (Docket No. 463), the Government has advised that it intends to charge only Speaks with possession of the weapon, and will not introduce evidence of the search against Fauntleroy, Jr. Therefore, Fauntleroy, Jr.'s Motion on this point is moot and the Court will address only Speaks's Motion.

affidavit accompanying the application for several search warrants, including the warrant for 7503 Reserve Circle, presented to United States Magistrate Judge Beth Gesner contained ample evidence to support a finding of probable cause, Speaks's Motion must be denied.

Direct evidence linking the place to be searched to the crime is not required for the issuance of a search warrant. United States v. Williams, 548 F.3d 311 (4th Cir. 2008). In drug cases, courts have repeatedly held that it is reasonable to infer that evidence of the drug trade will be found where drug dealers reside. See, e.g., United States v. Whitner, 219 F.3d 289, 297–98 (3d Cir. 2000) and cases cited therein.[5]

The issuing judge is entitled to rely on the affiant's training and experience on the issue whether those involved in certain types of illegality customarily store evidence in their homes. Once such a permissible inference has been drawn, the affidavit need only establish probable cause to believe that (1) the individual in question is involved in the drug trade and (2) the individual resides at the address for which the warrant is sought. Both prongs are satisfied in this case. First, through the wiretap on the C-line police intercepted numerous conversations in which Fauntleroy, Jr., discussed and arranged for drug transactions. For example, an April 7, 2010 call between Fauntleroy, Jr., and Defendant Victor Thornton proceeded as follows:

| | |
|---|---|
| Fauntleroy, Jr.: | Hello. |
| Thornton: | Yo |
| Fauntleroy, Jr.: | Um, I'm somewhere else. |
| Thornton: | Um, when you, when you go over there with cho. |
| Fauntleroy, Jr.: | Yeah. |

---

[5] As the Whitner court explained,
> The rationale underlying the foregoing line of cases is that evidence associated with drug dealing needs to be stored somewhere, and that a dealer will have the opportunity to conceal it in his home. After all, a dealer logically could conclude that his residence is the best, and probably the only, location to store items such as records of illicit activity, phone books, address books, large amounts of cash, assets purchased with proceeds of drug transactions, guns to protect drugs and cash, and large quantities of drugs to be sold.

Id. at 298.

11

| | |
|---|---|
| Thornton: | It's uh, it's under the mattress. For, for the other one I owed you for. |
| Fauntleroy, Jr.: | Yeah. |
| Thornton: | It's uh, it's under the mattress. For, for the other one I owed you for. |
| Fauntleroy, Jr.: | It's under the mattress. |
| Thornton: | Yeah just lift it up. Like just as soon as you go in lift it up on that same side you go in the house. |
| Fauntleroy, Jr.: | Alright. What I was getting to say. You ah. You, you say ah it's under the mattress. What for all three of them or just um. |
| Thornton: | Nah, just for that, just for that other one I owed you for. Member? |
| Fauntleroy, Jr.: | For that, for that half a vic?[6] |
| Thornton: | Yeah. |
| Fauntleroy, Jr.: | Alright. Alright. Bet. Bet. |

Gov't's Opp Ex. 11, Aff. in Supp. of Search Warrants 62, Docket No. 501. The affiant testified that, based on his training, knowledge, and experience, Thornton was telling Fauntleroy, Jr., where drugs were hidden and that the two were discussing how much money Thornton still owed Fauntleroy, Jr. Id. at 63. The two went on to discuss what the affiant believed to be more drugs that Thornton had hidden in the refrigerator. Id. In addition, the affidavit details numerous other conversations of similar tone and substance. See id. at 64–73. As to Taii Speaks, calls intercepted on the C-line between Fauntleroy, Jr., and Fauntleroy, Sr., suggest that Fauntleroy, Jr., was sending Speaks to his father's house to pick up drugs that had been left there (again stored in the refrigerator). Id. at 157.

Further evidence suggested that, despite being in the name of Fauntleroy, Jr.'s mother, the 7503 Reserve Circle address was the residence of Fauntleroy, Jr., and Speaks. In addition to physical surveillance of the apartment tending to establish that both Fauntleroy, Jr., and Speaks

---

[6] At oral argument, the Government proffered that football players' jersey numbers are often used as code to denote the amount of drugs being discussed. "Vic," references Philadelphia Eagles quarterback Michael Vick, and signifies seven grams of cocaine based on Vick's #7 jersey. This transcript aptly demonstrates the veiled, nonlinear character of drug conversations.

resided there, police intercepted a call in which Fauntleroy, Jr., asks his mother to call the rental office and have them fix the air conditioning. She agrees to do so, but has to ask her son for the address. Id. at 128–30.

The above provides more than sufficient probable cause for the issuance of a search warrant for 7503 Reserve Circle, Apt. 3. Accordingly, Speaks's Motion to Suppress evidence recovered during the search must be denied.

### III.  TRAFFIC AND PEDESTRIAN STOPS

Fauntleroy, Jr., also seeks to suppress his identification and various statements allegedly made during several encounters with the police. Docket No. 463. The Government has advised that, of the "stops" challenged by Fauntleroy, Jr., it plans to introduce only one at trial. The Court will, therefore, confine its analysis to this incident.

The following account of the stop is taken from the hearing testimony of Baltimore City Police Detective Shane Lettau. On June 26, 2009, police stopped a car driven by Robert Campbell for a seatbelt violation. Fauntleroy, Jr., was in the passenger seat. A canine unit was called and arrived within ten minutes. The dog alerted on the trunk and the driver's door. Police then searched the vehicle and the dog alerted on the center console, though in the end no drugs were found. Campbell and Fauntleroy, Jr., unprompted by any police questioning, allegedly asked, "Do you think we're dumb enough to hide something in a car and ride around here?" A verbal warning was issued for the seatbelt violation, and the two were released. The entire stop lasted approximately 20 minutes.

Fauntleroy, Jr., challenges the admissibility of the drug dog alerts and the alleged statement on the grounds that no probable cause existed for the stop. He also contends that the duration of the stop was unreasonable given the nature of the infraction.

A decision to stop an automobile is reasonable where a police officer has probable cause to believe a traffic violation has occurred, no matter how minor the traffic offense may be. Whren v. United States, 517 U.S. 806, 810 (1996). Detective Lettau testified that, as he passed Campbell's car going the opposite direction, he could clearly see that Campbell was not wearing a seatbelt. This infraction provided probable cause to stop the car.[7]

In determining whether the length of a detention is reasonable, courts may consider whether police officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 686 (1985). Based on Det. Lettau's testimony, the Court finds the duration of the stop to have been reasonable. According to Det. Lettau, the canine unit was called almost immediately. Det. Lettau called that unit based on his knowledge that Campbell and Fauntleroy, Jr., were targets of an ongoing drug investigation. Det. Lettau, following standard procedure for such a stop, then began to fill out the required citizen contact sheet and radioed police dispatch to request a check on Campbell's driver's license and vehicle registration, as well as a search for any outstanding warrants. Det. Lettau testified that he had

---

[7] When police spot a traffic infraction, they are permitted to stop the car even if they are using the infraction as an excuse to investigate other crimes. See United States v. Branch, 537 F.3d 328, 337 (4th Cir. 2008) ("if sufficient objective evidence exists to demonstrate reasonable suspicion, a Terry stop is justified regardless of a police officer's subjective intent."). The duration of the stop must be limited, however, to the time needed to complete the traditional incidents of a traffic stop. Id. This time may vary from situation to situation, though the same tasks are performed by the officers. For example, a license and warrant check is a traditional incident. The time required to conduct such a check may normally be 10–15 minutes. On any given day, however, the dispatcher may be slow or bogged down with requests, and may not respond for 25 minutes or more. This delay does not necessarily invalidate the stop, because a reasonable time is measured not in terms of minutes but in terms of required actions. Rather than subscribing to a bright-line rule that, for example, a stop for running a red light should last no more than 20 minutes, courts must analyze reasonableness on a case-by-case basis.

not yet received full responses to these inquiries when the police dog alerted on the exterior of the car. The stop, therefore, was not unduly prolonged by the police dog's "scan" of the vehicle's exterior. The alert then supplied probable cause for a search of the interior. See United States v. Branch, 537 F.3d 328, 340 n.2 (4th Cir. 2008).

In sum, both the initial stop and the subsequent search were reasonable and supported by probable cause. Fauntleroy, Jr.'s Motion to Suppress any evidence gained during the incident, including the alleged statement, must, therefore, be denied.

## IV.   MOTIONS TO SEVER, TO DISMISS COUNT ONE OF THE INDICTMENT, AND FOR A BILL OF PARTICULARS

Fauntleroy, Jr., has filed two additional motions that rest on a common argument. The first seeks severance of his case and a separate trial or, in the alternative, dismissal of Count One of the indictment against him as duplicitous. Docket No. 464. The second asks that the Government be required to file a bill of particulars. Docket No. 323.

Count One of the Superseding Indictment charges that from January 2009 and continuing through June 2010, 22 Defendants conspired to distribute and possess with the intent to distribute fifty grams or more of cocaine base, five kilograms or more of cocaine hydrochloride, and a mixture or substance containing a detectable amount of heroin. In both motions, Fauntleroy, Jr., argues essentially that, while there is undeniable drug activity in the Gilmore Homes housing project, there is no overarching conspiracy. As such, he contends, Count One combines multiple unrelated offenses, and a joint trial of these disparate offenses would result in the prejudicial introduction against him of evidence relevant only to others.

"[D]uplicity is the joining in a single count of two or more distinct and separate offenses." United States v. Burns, 990 F.2d 1426, 1438 (4th Cir. 1993) (internal quotation

15

omitted). However, "two or more acts, each of which would constitute an offense standing alone and which therefore could be charged as separate counts of an indictment, may instead be charged in a single count if those acts could be characterized as part of a single, continuing scheme." United States v. Kamalu, 298 F. App'x 251, 254 (4th Cir. 2008) (quoting United States v. Shorter, 809 F.2d 54, 56 (D.C. Cir. 1987)).

In essence, Fauntleroy, Jr.'s motions beg the very question to be decided at trial, that is, whether the Defendants were engaged in a single broad drug conspiracy. Generally, whether the Government has proved a single or multiple conspiracies is a question of fact for the jury. United States v. Roberts, 262 F.3d 286, 294 (4th Cir. 2000). A conspiracy need not be a hierarchical monolith with a clear organizational chart. It can be as simple as a "loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise of catering to the ultimate demands of a particular drug consumption market." United States v. Banks, 10 F.3d 1044, 1054 (4th Cir. 1993). For this reason, the court often must review the government's evidence in order to decide whether a reasonable jury could find the existence of the single conspiracy charged in the indictment.

This review is routinely done at the end of the Government's case-in-chief, when the court is considering the defendant's motion for a judgment of acquittal under Fed. R. Crim. P. 29. It would be wasteful and inefficient to require the Government to preview all of its conspiracy evidence in a lengthy pre-trial evidentiary hearing. Before trial, the court may undertake a preliminary determination of the Government's single conspiracy evidence, which is often done by receiving a proffer from Government counsel. In this case the Court is satisfied, based on such a proffer, that it is reasonable for Count One, the conspiracy count, to proceed at trial. The Court will painstakingly review the evidence once more at the close of the

Government's case-in-chief, and will not hesitate to declare a misjoinder if it becomes clear that no single conspiracy could be proved.

At present, however, the Court sees no reason to think that Fauntleroy, Jr., or the other Defendants will be prejudiced either by the broad language of Count One or by a joint trial. As such, the Defendants are not entitled at this time either to severance or to a bill of particulars,[8] and Count One of the indictment will not be dismissed as duplicitous.

### III.  Conclusion

For the reasons stated above, the Court will, by separate Order of even date, DENY the following Motions:

- Motion to Sever Defendant, or in the alternative, Motion to Dismiss Count One of the Superseding Indictment as Duplicitous by Dione Fauntleroy, Jr.  Docket No. 464.

- Motion for Bill of Particulars by Dione Fauntleroy, Jr.  Docket No. 323.

- Amended Motion to Suppress Tangible Evidence and Derivative Evidence by Dione Fauntleroy, Jr.  Docket No. 463.

- Motion to Suppress Evidence Seized by Taii Speaks.  Docket No. 468.

- Amended Motion to Suppress Evidence Obtained by Electronic Surveillance and Interception by Wire and Fruits of Wiretapping by Dione Fauntleroy, Jr.  Docket No. 462.

---

[8] A Defendant is not entitled to a bill of particulars as of right.  Wong Tai v. United States, 273 U.S. 77, 82 (1927).  There is even less need for a bill of particulars in a case such as this, in which the Government has provided extensive pretrial discovery putting the Defendants on notice of the specific nature of the charges against them.

Dated this 25th day of July, 2011.            /s/
                                     Benson Everett Legg
                                     United States District Judge